# FILED

**November 17, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| KENNETH DARON, | ) | |
| | ) | |
| Plaintiff/Appellee, | ) | Appeal No. |
| | ) | M1998-00217-COA-R3-CV |
| v. | ) | |
| | ) | Davidson Chancery |
| DEPARTMENT OF CORRECTION | ) | No. 97-3315 II |
| and the TENNESSEE CIVIL | ) | |
| SERVICE COMMISSION, | ) | |
| | ) | |
| Defendant/Appellant. | ) | |

## COURT OF APPEALS OF TENNESSEE

## APPEAL FROM THE DAVIDSON COUNTY CHANCERY COURT
## AT NASHVILLE, TENNESSEE

## THE HONORABLE CAROL McCOY, CHANCELLOR

PAUL G. SUMMERS
Attorney General and Reporter

TRAVENIA A. HOLDEN
425 5th Avenue North
Cordell Hull Building, Second Floor
Nashville, Tennessee 37243-0490
      ATTORNEYS FOR PLAINTIFF/APPELLEE

JEFFREY RAPPUHN
Willis & Knight
215 Second Avenue, North
Nashville, Tennessee 37201
        ATTORNEY FOR DEFENDANT/APPELLANT


                REVERSED AND REMANDED



                                    WILLIAM B. CAIN, JUDGE
            O P I N I O N

        The Department of Correction and the Tennessee Civil Service Commission appeal from the action of the Chancery Court of Davidson County in allowing attorney fees to Kenneth Daron in judicial review of the final order of the Civil Service Commission.

        Daron worked as a correction officer for the department in its Middle Tennessee Reception Center. He was terminated by Warden David Poindexter for violation of Department of Correction policy.

        Daron pursued his remedies under the Tennessee Administrative Procedures Act, *see* Tenn. Code Ann. §§ 4-5-101, *et seq.;* and the case was heard December 3, 1996, before Mattielyn B. Williams, Administrative Judge, with both the Department of Correction and Kenneth Daron represented by counsel. Following this hearing, the Administrative Law Judge made extensive findings of fact and conclusions of law and reduced the penalty of Daron from termination to a ten day suspension. The Administrative Law Judge denied the application of Daron for attorney fees "... because grievant did not prevail on all aspects of his appeal." The Civil Service Commission approved all of the findings of the Administrative Law Judge. Daron sought judicial review of the refusal to grant attorney fees in chancery court.

        Judicial review of a final order of the Civil Service Commission under the

Administrative Procedures Act is a limited review governed by Tennessee Code Annotated section 4-5-322(h). The trial court may reverse or modify the decision of the commission or agency only if the rights of the petitioner have been prejudiced because the decision of the commission is:

(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(5) Unsupported by evidence which is both substantial and material in the light of the entire record.

Tenn. Code Ann. § 4-5-322(h)(1998). This section further provides that:

In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency, as to the weight of the evidence on questions of fact.

The Administrative Law Judge made the following extensive findings of fact:

1. Middle Tennessee Reception Center, [("]MTRC") is a correctional facility operated by the Tennessee Department of Correction, ("Department"). MTRC receives felons who are classified and transferred to appropriate facilities.

2. Employees at MTRC are required by department policy and by MTRC Warden David Poindexter to maintain a professional relationship with inmates at the prison, primarily for security reasons.

3. Within a prison, certain items are identified as "contraband," and prohibited within the secure confines of the correctional facility. Inmates are not allowed to have United States currency in their possession. Such "green money" is dangerous in the hands of an inmate because it is an instrument of power to carry out illegal activities, such as drugs, alcohol, or assaults upon inmates or staff.

4. Department Policy #305.03, Employee-Inmate/ Probationer/Parolee Relationships, requires in Paragraph VI. B. That an employee "correct all inmates observed in violation of institutional rules and regulations in a fair, consistent, and impartial manner." Under Paragraph VI. D., "Social relationships are prohibited."

5. In Paragraph VIE [sic], Department Policy #305.03 further provides that employees are not to "carry, mail, pass or throw contraband in or out of any correctional institution." The main purpose of the policy is to keep contraband items from being brought into the prison by employees. Random frisks and metal detection searches are

conducted. When it is suspected that an employee is in possession of contraband and intending to enter the secure confines of the prison, policy allows a more intrusive search of the employee. That search is conducted in a search room in the check point area of the prison before the employee enters the secure confines of the prison.

6. When an employee, is suspected of having contraband items from an inmate that are to be taken outside the secure confines of the prison, it is the general practice that the search of the employee will not be delayed until the employee leaves the secure confines of the facility. Such an employee will be searched prior to their leaving the facility.

7. On or about May 23, 1996, Nurse Douglas resigned her employment with the Department and was recommended not to be rehired in that Department. Douglas resigned due to her violation of Department Regulation 305.03, carrying on an improper inmate/ staff relationship.

8. On Friday, May 22, 1996, Correctional Officer Joseph McCool, found money during a random search of Inmate Harlan, McCool failed to properly confiscate that contraband. McCool should have placed the contraband in an evidence bag and given it to a superior officer.

9. When McCool asked Inmate Harlan what he was doing with the money, the inmate did not reply but proceeded to call out to Grievant, Correctional Officer I Kenneth Daron, who was also standing on the yard. Surmising, based on his experience, that the money was for the purpose of procuring drugs, McCool allowed the inmate to retain the money, in order to not only confiscate the money, but possibly to confiscate the drugs that he believed the money was intended to be used to obtain. McCool should have placed the contraband in an evidence bag and given it to a superior officer.

10. McCool followed Inmate Harlan and Grievant over to the clinic where Harlan and Grievant were engaged in conversation. McCool observed Harlan hand Grievant some money which Grievant appeared to place in his own boot. When McCool stepped into the clinic and asked "What – what is going on?", Grievant said something about not being able to keep his boots tied; the laces were on the floor. In response to McCool's inquiry about whether the money was for pizza or perfume, Grievant responded, "How do I know?" When McCool observed Grievant receive money from an inmate and place it into his boot, McCool felt the need to report the entire incident and no longer was concerned about his own welfare and involvement in the scenario.

11. Captain George Thompson, wrote a letter in support of Officer McCool's conduct in allowing the inmate to retain the money, while at the same time monitoring the inmate's movement. Thompson disciplined Officer McCool for conducting an unauthorized investigation. McCool received a written warning for negligence in the performance of his duties, due to his violation of Tennessee

Department of Correction Policy #506.15, "Disposition of Contraband", for failing to remove and confiscate the contraband from the inmate. That Policy makes it the "duty of each employee to correct all inmates observed in violation of institutional rules and regulations."

12. That same day, Al Rivers, Internal Affairs Investigator, learned of this contraband money incident from McCool. Upon arriving, at Rivers' office, Grievant asked Rivers what was going on. Rivers asked Grievant to remove his boots. Finding no money, Rivers informed Grievant that, "I understand that you have some money. Where is it?" Grievant replied that the money was "in my pants", meaning his spandex pants underneath his uniform pants. Grievant showed Rivers the currency, two (2) folded twenty (20) dollar bills. At first, Grievant indicated to Rivers that the money was his own.

13. After Rivers informed Grievant that he knew Grievant had received the money from Harlan, Grievant concurred and Grievant further admitted to Rivers that the inmate had given the money to him, at Grievant's own suggestion.

14. Rivers did not threaten Grievant. At the end of his meeting with Rivers on Friday, May 22, 1996, Grievant stated that he did not feel good, took off his correctional officer badge, stated that he was resigning, and threw the badge onto Rivers' desk.

15. That next Monday, May 25, 1996, Rivers received a telephone call from Grievant requesting another meeting. Grievant indicated to Rivers that Sonya Douglas, an MTRC Nurse, was the source of the money. Grievant admitted to Rivers that the inmate gave him the money to return to Nurse Douglas. Grievant informed Rivers that it was his desire to keep the inmate "out of trouble." Grievant so testified at the hearing, as well.

16. Rivers' office is located in the Administration Building, outside the checkpoint area and marks the entrance into the secure confines of the prison. The search room is also located outside the checkpoint area.

17. Grievant worked in the area of the clinic where Nurse Douglas would have been on duty on March 22, 1996 and, therefore, should have been aware of whether she was at work that day. Nurse Douglas was not at the clinic during the time in question.

18. Grievant asserted, at the hearing, that he initially denied possession of the money to Rivers because of Rivers' abusive tone.

19. On April 2, 1996, Associate Warden Perry met with Grievant and conducted a due process hearing. Following the due process hearing, Warden Perry reported his findings to Warden Poindexter.

20. Warden Poindexter disciplined Grievant because he considered that Grievant, per his own admission, became part of a private plan between Harlan and Grievant to "get rid of" the money and return it to Nurse Douglas. Warden Poindexter, in determining the appropriate discipline to impose upon Grievant, considered levels of

disciplinary action available to him as the appointing authority.

21. Department Policy #305.03, Paragraph VI. E., in addi-tion to prohibiting the carrying of contraband into or out of a prison, mandates that "an employee shall not trade or barter with inmates ... Should an employee have knowledge of any employee engaged in such trafficking, it is the employee's duty to report such information to his/her supervisor." Paragraph VI. F continues "Employees who violate this policy, or fail to report a violation of this policy, shall be subject to disciplinary action up to and including termination."

22. On April 9, 1996, Warden Poindexter notified Grievant that was dismissed Grievant from state employment for violation of Department Policy #305.03. [sic] Warden Poindexter believed that Grievant had violated "professional distance" to the extent that he had become the "weak link in the chain" of security, based upon Grievant's hiding and attempted transfer of the money from Inmate Harlan to Nurse Douglas.

23. Bias has been alleged by Grievant in the first four steps in the disciplinary proceedings, based upon Warden Poindexter's statement to Grievant, to the effect that, "We hate to see you go." At the hearing, Warden Poindexter, could not recall when the statement was made to Grievant. When asked by Grievant's counsel to assume that he (Warden Poindexter) made the statement to Grievant prior to the due process hearing, Warden Poindexter explained his statement, as simply stating that the nature and seriousness of the infractions alleged, if true, could lead to significant discipline.

24. Associate Warden Perry did recall having a discussion with second shift Captain George Thompson and Sergeant James Omntvedt concerning vacancies. This discussion was held before Associate Warden Perry conducted the due process hearing. Associate Warden Perry informed Thompson and Omntvedt that "things don't look good for him (Grievant) at this point" and may have stated something to the effect that Grievant "may not be here". Associate Warden Perry had already taken advantage of the opportunity to review the reports and the statement which Grievant had given to Internal Affairs, admitting to committing the acts that brought the charges against him. Associate Warden Perry testified that at no time did he make any statement during this discussion that Grievant was definitely going to be terminated.

25. Sergeant Omntvedt disputed Captain Thompson's and Associate Warden Perry's version of what occurred during their discussion.

26. Apart from his actions on March 22, 1996, Grievant had received no other write-ups, warnings, suspensions, or other disciplining action during his twenty-one (21) months of employment with the Tennessee Department of Correction.

A review of the record in this case discloses that the above findings of fact are supported "by evidence which is both substantial and material." In fact, Daron takes no serious issue with these findings.

The appeal in the chancery court as well as in this court is limited to whether or not Daron is entitled to attorney fees. The statute governing the issue provides:

> The commission may, in its discretion, award attorney's fees and costs to a successfully appealing employee. Attorney's fees awarded by the commission shall be awarded at the same rates established for the defense counsel commission. Fees established by this section shall apply to disciplinary actions consisting of suspension of ten (10) days or more, demotion or termination of employment. Disciplinary actions consisting of suspensions of less than ten (10) days and all other grievable matters shall continue to follow the schedule outlined in the rules of the department for reimbursement of attorney's fees.

Tenn. Code Ann. § 8-30-328(f)(1998).

The chancellor, in construing this statute, holds it to be analogous to the provisions of the Federal Civil Rights Act wherein 42 U.S.C. sec. 1988 provides for discretionary allowance of attorney's fees to the prevailing party.

Nothing in section 328(f), its pre-enactment history or subsequent construction indicates a legislative intent to make its provisions analogous to a civil rights violation. It is Kenneth Daron in this case who is the transgressor and not the Department. It is he who knowingly violated department policy in a manner sufficient to justify his termination. Far from violating his civil rights, both the Administrative Law Judge and the Civil Service Commission, acting under statutory provisions which commit primary jurisdiction and broad discretion to them and not the courts, acted with mercy and compassion in reducing Daron's punishment from termination to ten days suspension. Daron makes no complaint about the procedure before the Administrative Law Judge or before the Civil Service Commission. He simply complains that after the Administrative Law Judge and the Civil Service Commission reduced the penalty for his own violation of Department of Correction's policy, he was victim to an abuse of discretion by the Civil Service Commission in

disallowing attorney fees. The commission found that Daron " ... committed several acts of misconduct ... ." The record contains substantial evidence to support this finding. The same commission, exercising the discretion vested in it by the controlling statute. refused to allow attorney fees to one guilty of misconduct. In so acting, the commission violated no constitutional or statutory provision. It did not act in excess of its statutory authority. It did not act upon unlawful procedure. Its decision was not arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. Its decision was supported by evidence which is both substantial and material in light of the entire record.

Following *Steven H. Norris, Commissioner v. David M. Boynton*, 1989 WL 97958 (Tenn. Ct. App.), several decisions of Administrative Law Judges, not appealed to the courts. have held that Tennessee Code Annotated section 8-30-328(f) requires an employee to prevail in all aspects of his appeal before he may be awarded attorney fees. *Dep't of Mental Health and Mental Retardation v. Herron*, No. 26.15-45-0156J, (Civ. Serv. Comm'n, May 16, 1995); *Dep't of Finance Administration v. Bobbie Morgan*, No. 26.09-23-0485J, (Civ. Serv. Comm'n, Mar. 30, 1994); *Tennessee Dep't of Correction v. Baker, et al.*, No. 26.05-0684J (Civ. Serv. Comm'n, Sept. 3, 1996); *Dep't of Correction v. Willie Jones*, No. 26.05-34-0425J (Civ. Serv. Comm'n, Feb. 24, 1995) and *Raymond Bickford v. Dep't of Correction*, No. 26.05-56-0885J (Civ. Serv. Comm'n, Dec. 16, 1998).

*Norris v. Boynton* involved a case of an Administrative Law Judge reinstating an employee of Taft Youth Center following his acquittal on trial for selling drugs which had formed the basis for his dismissal from state service. His reinstatement was by an agreed order which reserved questions of back pay and attorney fees. The Administrative Law Judge disallowed back pay and attorney fees but was reversed by the Civil Service Commission. The Commissioner of Corrections appealed to the Davidson County Chancery Court which affirmed the order of the Civil Service Commission. The Court of Appeals reversed the chancellor holding that the original decision to terminate Boynton was supported by substantial

evidence and that both the Civil Service Commission and the trial court erred in allowing attorney fees. Whether *Boynton* is properly construed in the above cases not appealed to the courts is a question not necessary to the decision in this case. Daron clearly violated Department of Correction's policy. The Civil Service Commission, in its discretion, refused to award attorney fees. In so ruling, it has not abused the discretion vested in it by Tennessee Code Annotated section 8-30-328(f).

The judgment of the chancellor is reversed and the case is remanded to the chancery court for such further proceedings as may be necessary. Costs of the appeal are assessed against the appellee.

_____
WILLIAM B. CAIN, JUDGE


CONCUR:


_____
BEN H. CANTRELL, P.J., M.S.


_____
WILLIAM C. KOCH, JR., JUDGE